**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 2021-cv-02063

CITY OF FORT COLLINS,

      Plaintiff,

vs.

OPEN INTERNATIONAL, LLC, and
OPEN INVESTMENTS, LLC.

      Defendants.

---

# ANSWER AND COUNTERCLAIM

## TABLE OF CONTENTS

ANSWER ................................................................................................................................1

AFFIRMATIVE DEFENSES ...............................................................................................11

COUNTERCLAIMS ...............................................................................................................13

    A.   The City Seeks Bids for Utilities Software and Selects Open .........................................18

    B.   The Master Professional Services Agreement and Statement of Work .........................19

    C.   The City Breaches the MPSA from the Outset .............................................................22

        i.   The City Fails to Satisfy Its Staffing and Project Management Obligations ...........23

        ii.  The City Fails to Scope the Project and Breaches Its Configuration, Conversion, and Integration Obligations .................................................................25

    D.   Open Successfully Launches Broadband and the City Praises Its Performance ............27

    E.   The City Fails to Rectify Staffing and Other Breached Obligations, Stalling the Project Throughout 2020 .............................................................................................28

        i.   The City Admits Its Breaches Amid Efforts to Amend the MPSA ........................29

        ii.  The City Fails to Meet Its Obligations Under the First Amendment .....................31

        iii. The City Praises Open's Product and Partnership ..................................................33

    F.   Open Agrees to One Final Reset Attempt by the City with Project Change Request 29 ...................................................................................................................34

    G.   Open Notifies the City of Default and the City Promptly Purports to Terminate and Withholds Payment Due to Open ..........................................................................36

## ANSWER

Defendants Open International, LLC and Open Investments, LLC (collectively, "Defendants"), by and through their attorneys of record, Holland & Hart LLP, respond to the allegations in Plaintiff City of Fort Collins's (the "City") Complaint as follows:

### ANSWER TO INTRODUCTION

1.      Defendants deny the allegations set forth in Paragraph 1 of the Complaint.

2.      Defendants deny the allegations set forth in Paragraph 2 of the Complaint.

### ANSWER TO PARTIES, JURISDICTION, AND VENUE

3.      Defendants admit the allegations set forth in Paragraph 3 of the Complaint.

4.      Defendants admit the allegations set forth in Paragraph 4 of the Complaint.

5.      Defendants admit the allegations set forth in Paragraph 5 of the Complaint.

6.      The Master Professional Services Agreement ("MPSA") speaks for itself, and Defendants deny any allegations in Paragraph 6 to the extent they conflict with the MPSA.

7.      Defendants deny the allegations set forth in Paragraph 7 of the Complaint.

8.      Defendants removed this action to this Court, and as such, no response is required.

9.      Defendants removed this action to this Court, and as such, no response is required.

### ANSWER TO GENERAL ALLEGATIONS

10.     Defendants admit the allegations set forth in Paragraph 10 of the Complaint.

11.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 11 and therefore deny the same.

12.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 12 and therefore deny the same.

13.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 13 and therefore deny the same.

14.     Defendants admit that the City provides traditional utility services to its residents. Defendants are otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 14 and therefore deny the same.

15.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 15 and therefore deny the same.

16.     Senate Bill 05-152 ("SB-152") speaks for itself, and Defendants deny any allegations in Paragraph 16 to the extent they conflict with the SB-152. Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 16 and therefore deny the same.

17.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 17 and therefore deny the same.

18.     Defendants admit that Fort Collins residents voted to have the City provide certain telecommunications facilities and services. Defendants are otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 18 and therefore deny the same.

19.     Defendants admit that the City lacked the capability to provide customer care and billing support for both its utilities and telecommunications customers. Defendants are otherwise

without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 19 and therefore deny the same.

20.　　Request for Proposal 8697 ("RFP") speaks for itself, and Defendants deny any allegations in Paragraph 20 to the extent they conflict with the RFP. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 20 and therefore deny the same.

21.　　Defendants admit the allegations contained in Paragraph 21 of the Complaint.

22.　　Defendants admit the allegations contained in in Paragraph 22 of the Complaint with the exception of the word "purported."

23.　　Defendants' response to the RFP ("RFP Response") speaks for itself, and Defendants deny any allegations in Paragraph 23 to the extent they conflict with the RFP Response.

24.　　Defendants' RFP Response speaks for itself, and Defendants deny any allegations in Paragraph 24 to the extent they conflict with the RFP Response.

25.　　Defendants' RFP Response speaks for itself, and Defendants deny any allegations in Paragraph 25 to the extent they conflict with the RFP Response.

26.　　Defendants' RFP Response speaks for itself, and Defendants deny any allegations in Paragraph 26 to the extent they conflict with the RFP Response.

27.　　Defendants' RFP Response speaks for itself, and Defendants deny any allegations in Paragraph 27 to the extent they conflict with the RFP Response.

28.　　Defendants' RFP Response speaks for itself, and Defendants deny any allegations in Paragraph 28 to the extent they conflict with the RFP Response.

29.     Defendants deny the allegations set forth in Paragraph 29 of the Complaint.

30.     Defendants admit that they entered into the MPSA and a Software License Agreement, which contained integration clauses, as of August 8, 2018, but otherwise deny the allegations contained in Paragraph 30, including any implication that they wrongly or fraudulently induced the City into executing the MPSA or Software License Agreement.

31.     Defendants deny the allegations set forth in Paragraph 31, including that they wrongfully or fraudulently induced the City into any contractual relationship. Defendants admit that they agreed to a "Statement of Work" ("SOW")—not a "Scope of Work"—that was memorialized in Exhibit C to the MPSA, not separately executed, and that the City attached to its Complaint in Exhibits 1 and 3 thereto. Defendants hereafter assume that the City's allegations regarding the SOW refer to the Statement of Work.

32.     The SOW speaks for itself, and Defendants deny any allegations in Paragraph 32 to the extent they conflict with the SOW.

33.     The MPSA and the Software License Agreement speak for themselves, and Defendants deny any allegations in Paragraph 33 to the extent they conflict with the MPSA or the Software License Agreement.

34.     Defendants admit the allegations contained in Paragraph 34 of the Complaint.

35.     The MPSA, SOW, RFP, RFP Response, and the Software License Agreement speak for themselves, and Defendants deny any allegations in Paragraph 35 to the extent they conflict with those documents. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in the second sentence of Paragraph 35

and therefore deny the same. Defendants admit the allegations contained in the third sentence of Paragraph 35.

36. Defendants deny the allegations contained in Paragraph 36 of the Complaint.

37. Defendants deny the allegations contained in Paragraph 37 of the Complaint.

38. The SOW speaks for itself, and Defendants deny any allegations in Paragraph 38 to the extent they conflict with the SOW. Defendants otherwise deny the allegations contained in Paragraph 38 of the Complaint.

39. Defendants deny the allegations contained in Paragraph 39 of the Complaint.

40. Defendants deny the allegations contained in Paragraph 40 of the Complaint.

41. Defendants deny the allegations contained in Paragraph 41 of the Complaint.

42. Defendants admit that the City repeatedly altered the project scope and parameters and terminated the project before it was complete. Defendants otherwise deny the allegations contained in Paragraph 42 of the Complaint.

43. Defendants deny the allegations contained in Paragraph 43 of the Complaint.

44. The RFP Response and SOW speak for themselves, and Defendants deny any allegations in Paragraph 44 to the extent they conflict with the RFP Response and SOW.

45. The SOW speaks for itself, and Defendants deny any allegations in Paragraph 45 to the extent they conflict with the SOW. Defendants otherwise deny the allegations contained in Paragraph 45 of the Complaint.

46. Defendants deny the allegations contained in Paragraph 46 of the Complaint.

47. Defendants deny the allegations contained in Paragraph 47 of the Complaint.

48.     Defendants admit that they agreed to the First Amendment to the MPSA ("First Amendment"), which speaks for itself, and Defendants deny any allegations contained in Paragraph 48 to the extent they conflict with the First Amendment.

49.     Defendants deny the allegations contained in Paragraph 49 of the Complaint.

50.     Defendants deny the allegations contained in Paragraph 50 of the Complaint.

51.     The RFP Response speaks for itself, and Defendants deny any allegations in Paragraph 51 to the extent they conflict with the RFP Response.

52.     The MPSA speaks for itself, and Defendants deny any allegations in Paragraph 52 to the extent they conflict with the MPSA.

53.     Defendants deny the allegations contained in Paragraph 53 of the Complaint.

54.     Defendants admit that they have rolled out new versions of the product but deny the remaining allegations contained in Paragraph 54 of the Complaint.

55.     Defendants deny the allegations contained in Paragraph 55 of the Complaint.

56.     Defendants deny the allegations contained in Paragraph 56 of the Complaint.

57.     Defendants deny the allegations contained in Paragraph 57 of the Complaint.

58.     Defendants deny the allegations contained in Paragraph 58 of the Complaint.

59.     Defendants deny the allegations contained in Paragraph 59 of the Complaint.

60.     Defendants admit sending the Notice of Default on May 19, 2020. The Notice of Default speaks for itself, and Defendants deny any allegations in Paragraph 60 to the extent they conflict with the Notice of Default.

61.     The Notice of Default speaks for itself, and Defendants deny any allegations in Paragraph 61 to the extent they conflict with the Notice of Default. Defendants deny that the City provided a complete and prioritized issue list on March 23, 2021.

62.     The Notice of Default and SOW speak for themselves, and Defendants deny any allegations in Paragraph 62 to the extent they conflict with the Notice of Default and SOW. Defendants deny the remaining allegations contained in Paragraph 62 of the Complaint.

63.     Defendants deny the allegations contained in Paragraph 63 of the Complaint. Defendants note that the City sent them a Notice of Dispute and Notice of Termination ("Notice of Dispute"), dated May 28, 2021. Even if The City intended to refer to this Notice of Dispute in Paragraph 63 of the Complaint, the Notice of Dispute speaks for itself, and Defendants deny any allegations in Paragraph 63 to the extent they conflict with the Notice of Dispute. And, as noted, Defendants deny the remaining allegations contained in Paragraph 63 of the Complaint.

64.     Defendants admit that they met with the City on June 17, 2021, and the City requested that Open International, LLC document a proposal to complete the project. Defendants otherwise deny the allegations contained in Paragraph 64 of the Complaint.

65.     Defendants admit that they delivered a proposal to the City on June 28, 2021. Defendants otherwise deny the allegations contained in Paragraph 65 of the Complaint.

66.     Defendants deny the allegations contained in Paragraph 66 of the Complaint.

## ANSWER TO FIRST CLAIM FOR RELIEF
### (Fraudulent Inducement)

67.     Defendants repeat and incorporate by reference their responses to the preceding paragraphs as if fully set forth herein.

68.     Defendants deny the allegations contained in Paragraph 68 of the Complaint.

69.     The RFP Response speaks for itself, and Defendants deny any allegations in Paragraph 69 to the extent they conflict with the RFP Response. Defendants deny the remaining allegations contained in Paragraph 69 of the Complaint, including that they wrongfully or falsely represented facts.

70.     Defendants deny the allegations contained in Paragraph 70 of the Complaint.

71.     Defendants deny the allegations contained in Paragraph 71 of the Complaint.

72.     Defendants deny the allegations contained in Paragraph 72 of the Complaint.

73.     Defendants deny the allegations contained in Paragraph 73 of the Complaint.

74.     Defendants deny the allegations contained in Paragraph 74 of the Complaint.

75.     Defendants deny the allegations contained in Paragraph 75 of the Complaint.

76.     Defendants deny the allegations contained in Paragraph 76 of the Complaint.

77.     Defendants admit the allegations contained in Paragraph 77 of the Complaint.

**ANSWER TO SECOND CLAIM FOR RELIEF**
**(Breach of Contract)**

78.     Defendants repeat and incorporate by reference their responses to the preceding paragraphs as if fully set forth herein.

79.     Defendants admit the MPSA, Software License Agreement, and First Amendment to the MPSA are valid and enforceable contracts by and between the City and Defendants.

80.     The MPSA, Software License Agreement, and First Amendment speak for themselves, and Defendants deny any allegations in Paragraph 80 to the extent they conflict with those documents.

81.     Defendants deny the allegations contained in Paragraph 81 of the Complaint.

82.     Defendants admit the allegations contained in Paragraph 82 of the Complaint, except as to the word "Specifically."

83.     Defendants deny the allegations contained in Paragraph 83 of the Complaint.

84.     The MPSA, Software License Agreement, and First Amendment speak for themselves, and Defendants deny any allegations in Paragraph 84 to the extent they conflict with those documents. Defendants otherwise deny the allegations contained in Paragraph 84 of the Complaint.

85.     Defendants deny the allegations contained in Paragraph 85 of the Complaint.

86.     Defendants deny the allegations contained in Paragraph 86 of the Complaint.

87.     To the extent a response is required to Paragraph 87, Defendants deny any allegation therein.

**ANSWER TO THIRD CLAIM FOR RELIEF**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

88.     Defendants repeat and incorporate by reference their responses to the preceding paragraphs as if fully set forth herein.

89.     To the extent a response is required to Paragraph 89, Defendants deny any allegation therein.

90.     Defendants admit they entered into the MPSA, Software License Agreement, and First Amendment with the City.

91.     The MPSA, Software License Agreement, and First Amendment speak for themselves, and Defendants deny any allegations in Paragraph 91 to the extent they conflict with those documents.

92.     Defendants deny the allegations contained in Paragraph 92 of the Complaint.

93.     Defendants deny the allegations contained in Paragraph 93 of the Complaint.

94.     Defendants deny the allegations contained in Paragraph 94 of the Complaint.

## ANSWER TO FOURTH CLAIM FOR RELIEF
### (Declaratory Judgment)

95.     Defendants repeat and incorporate by reference their responses to the preceding paragraphs as if fully set forth herein.

96.     Defendants admit there is an actual and justiciable controversy between the City and Defendants regarding their rights and obligations under the MPSA, Software License Agreement, and First Amendment.

97.     Defendants deny the allegations contained in Paragraph 97 of the Complaint.

98.     Defendants admit that a judicial declaration of the Parties' rights and obligations with respect to the MPSA, Software License Agreement, and First Amendment would remove uncertainty.

99.     Defendants admit the allegations contained in Paragraph 99 of the Complaint.

100.    Defendants deny the facts alleged in Paragraph 100 of the Complaint and that the City is entitled to the relief requested in Paragraph 100.

101.    Defendants deny the facts alleged in Paragraph 101 of the Complaint and that the City is entitled to the relief requested in Paragraph 101.

*     *     *

All allegations not specifically admitted in the foregoing responses are hereby denied.

## ANSWER TO PRAYER FOR RELIEF

Defendants deny that the City is entitled to any of the relief requested in its Prayer for Relief.

## AFFIRMATIVE DEFENSES

Defendants plead the following affirmative defenses based on information they know at this time. Defendants may have additional affirmative defenses that are not yet known to them, but which may become known through discovery. Accordingly, Defendants specifically reserve the right to assert additional affirmative defenses as they become known during the course of litigation or to withdraw defenses as appropriate.

### First Affirmative Defense

The claims alleged in the City's Complaint are barred by the applicable statute of limitations.

### Second Affirmative Defense

The City failed to satisfy conditions precedent under the Agreements.

### Third Affirmative Defense

The City's claims are barred by the doctrine of laches.

### Fourth Affirmative Defense

The City's alleged damages are the result of the breach of its own obligations under the MPSA, Software Licensing Agreement, First Amendment, and Project Change Request 29.

### Fifth Affirmative Defense

The City's material breach of the MPSA, Software Licensing Agreement, First Amendment, and Project Change Request 29 preceded any allegedly breaching conduct by Defendants.

### Sixth Affirmative Defense

The City failed to mitigate or otherwise act to lessen or reduce the damages alleged.

### Seventh Affirmative Defense

The City's claims are barred by the doctrines of waiver and estoppel.

### Eighth Affirmative Defense

The City's claims are barred, in whole or in part, by the doctrines of recoupment and setoff.

### Ninth Affirmative Defense

The City's claims are barred by the doctrine of impracticability, impossibility or hindrance of contract.

### Tenth Affirmative Defense

The City's claims are barred by the doctrine of unclean hands.

WHEREFORE, Defendants pray for the following relief:

1.      For the Court to dismiss the City's claims with prejudice and/or deny all relief requested in the City's Complaint;

2.      Defendants be granted their attorneys' fees and costs as permitted by the Agreements; and

3.      For such other relief as the Court deems just and proper.

## <u>COUNTERCLAIMS</u>

Counter-Plaintiff Open International, LLC ("Open") by and through counsel complains against Counter Defendant City of Fort Collins's (the "City" or "Fort Collins").

## PRELIMINARY STATEMENT

1.     Through a community-owned utility, Fort Collins provides its residents with light and power, water, wastewater, and stormwater services, which have operated for more than twenty years on a homegrown software system.

2.     In 2018, after choosing to add broadband to the suite of services offered to residents, the City sought a new software system to uniformly administer all its utilities and broadband offerings.

3.     These large-scale services, which altogether generate more than $200 million per year in municipal revenue, required a large-scale, sophisticated software solution.

4.     Open is an international software provider with 34 years of experience implementing customer information systems, or CISs, for utilities and telecommunication service providers, including municipalities like Fort Collins, and Open was eager to showcase its offerings in the U.S. utilities market.

5.     Accordingly, Open bid to provide the City's new software system.

6.     After six months and a competitive, in-depth due diligence process, the City chose Open to implement a software solution for operating and billing its broadband and utilities services with an initial budget of roughly $7 million.

7.     The City chose to bifurcate the project, with initial plans to launch the broadband software solution in summer 2019 and the utilities portion in the fall.

8.      The City knew and agreed that achieving this multi-year, multimillion-dollar project would require substantial collaboration between Open and the City.

9.      Moreover, the City knew and accepted that it was the first customer for which Open would implement such a comprehensive product in the U.S. marketplace, and that this groundbreaking project could not move forward without extensive participation by City personnel.

10.     Accordingly, in the Master Professional Services Agreement (the "MPSA") with Open, the City promised to collaborate and provide adequate staffing and support to facilitate the project.

11.     For its part, Open gave the City's project undivided attention and resources; as the City acknowledged, Open's conduct from day-one was "truly a reflection of their commitment to th[e] partnership" with Fort Collins.

12.     But the City did not live up its promises.

13.     From the start, the City acknowledged that it was "scrambling to fill out the roster . . . on this project."

14.     It failed to assign adequate staff, missing as many as ten critical IT and customer-connection specialists at a given time.

15.     The City also abdicated its role in project leadership and administration, leaving the CIO, a key role for the City's performance of the project, empty for nearly a year and employing a rotating cast of project managers and vendor managers that was incapable of sustained, focused performance of the City's MPSA obligations.

16.     Amid this vacuum of City staffing and leadership, the City shifted priorities and added all-new, unscoped functionalities to the project that, according to the City, inserted a "significant amount of complexity" that Open had not agreed to.

17.     Even so, Open delivered the broadband solution in summer 2019, which the City accepted, paid for, and touted to the marketplace as a "successful launch."

18.     The process of stabilizing that system and delivering the utilities solution could not proceed, however, without the City's participation and cooperation.

19.     Throughout 2020, officials acknowledged the problems the City was causing.

20.     One official stated directly that, a year-and-a-half into the project, the City still had not defined clear decision-makers for implementing the project, which resulted in a poorly operated project with little accountability on the City's side and hobbled efforts to schedule, resolve varying approaches and mixed messages, and guide the OPEN team.

21.     The official warned, too, that the City had no fully dedicated IT staff for the project and only a few fully dedicated business and operations team members, despite the City's clear staffing obligations in the MPSA, which the official worried the City might be liable for breaching.

22.     Another official confirmed to the City Council that the bulk of responsibility for delays and cost overruns "lies on our side," and that Open had done "nothing significant, nothing major" to contribute to those problems.

23.     But nothing changed.

24.     While the City publicized its approval and appreciation of Open's work, telling industry experts in fall 2020 that "Open Smartflex is the right tool for us," over time, it became clear the City was not a good partner for Open.

25.     After another half-year badgering City executives and striving to plug the holes in the City's staffing and specifications, Open notified the City of multiple defaults under the MPSA that were preventing Open from stabilizing the broadband software solution and implementing the utilities software.

26.     In its May 19, 2021 notice, Open warned that, if the City did not cure these defaults within 30 days, Open would terminate the MPSA and require payment of millions of dollars for retained fees and unpaid work.

27.     Although the City had repeatedly admitted responsibility for project delays and other problems, the City responded to Open's notice of default by sending its own "Notice of Dispute and Notice of Termination," without ever serving Open with a notice of default.

28.     Remarkably, even as it terminated the MPSA, the City demanded that Open continue to provide services for the broadband software system.

29.     In an effort to avoid conflict and allow the City to cure its defaults, Open met with the City in June 2021. At the City's request, Open worked around the clock to prepare a comprehensive, 40-page proposal with extensive exhibits detailing what remained to be accomplished and how Open could complete the project even as the City failed to live up to its responsibilities.

30.     As it had before, Open agreed to share the costs for completion and didn't seek a dime in additional payment until the project was done.

31.     A few days later, instead of responding, the City commenced this action, bypassing the required processes under the MPSA, and shunning Open's good faith attempt to refocus the City's meandering efforts, and characterizing Open's offer to share in the City's costs as a stick-up job.

32.     But it is the City's breaching conduct that has harmed Open.

33.     By failing to provide staffing, scoping, and specifications required under the parties' contract, the City forced Open to bear millions of dollars in extra costs, and Open gets no benefit from those costs now that the City has terminated the MPSA.

34.     Moreover, even after terminating the parties' contract, the City has withheld more than three million dollars for work that it approved for payment and that Open performed.

35.     Worst of all, the City has tainted Open's otherwise sterling reputation in the market with false and misleading public accusations.

36.     From the day the City selected it, Open has worked to bring an elegant software solution to the City and its residents to administer their utilities and telecommunications offerings. The City's persistent failure to join in that effort and live up to its responsibilities has sabotaged the project and deprived Fort Collins residents of services they need.

## PARTIES, VENUE, AND JURISDICTION

37.     Open International, LLC is a Florida limited liability company with its principal place of business at 13019 Mar Street, Coral Gables, Florida 33156.

38.     The City is a home rule municipality organized under Article XX of the Colorado Constitution with a City Hall located at 300 Laporte Avenue, Fort Collins, Colorado 80521.

39.     Accordingly, this Court has original jurisdiction under 28 U.S.C. § 1332 and supplemental jurisdiction under 28 U.S.C. § 1367(b). As to original jurisdiction, this is a dispute between citizens of different states, and the matter in controversy exceeds the sum or value of $75,000—Open seeks millions of dollars in damages arising from its counterclaims. As to supplemental jurisdiction, the counterclaims arise out of the same controversy as set forth in the City's Complaint.

40.     The Court has personal jurisdiction over the City because it is a Colorado municipality and submitted itself to jurisdiction here by filing its Complaint in this Court.

41.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the counterclaims occurred here.

## GENERAL ALLEGATIONS

**A.     The City Seeks Bids for Utilities Software and Selects Open**

42.     In February 2018, when the City opted to develop a single software system for its existing utilities and new broadband services, it published Request for Proposal 8697 for "Vendor Selection and Implementation of a Comprehensive Solution for Utilities/Broadband Billing" (the "RFP"), and Open responded.

43.     Open has achieved more than 100 successful software implementations across the Americas, including for service providers like Fort Collins.

44.     Open's leading software product, Open Smartflex, conforms with globally recognized quality standards and undergoes annual audits by third-party experts, and it is currently operating successfully in cities with millions of customers as well as in cities the size of Fort Collins.

45.     In the RFP process, the City interacted with all vendors who were equipped to serve a mid- to large-size utility and who could provide utility and broadband integration.

46.     From more than a half-dozen initial contenders, the City selected Open for its shortlist of vendor finalists.

47.     The City subjected Open to a months-long due diligence process that included site visits, product walkthroughs, and examination by more than 20 subject-matter experts, directors, and executives from throughout City government, including specialists in IT, billing, customer care, finance, field service, asset management, broadband, and utilities.

48.     Finally, in June 2018, the City and Open agreed to a term sheet under which the City would become the first user of Open's Smartflex software product in the United States, and Open would give the City special commercial conditions and assurances, including financial and software escrows.

49.     The parties thereafter entered into the MPSA on August 9, 2018, with an initial term of three years, and an option to renew for up to two additional years.

50.     Among other things, the MPSA incorporated a detailed Statement of Work ("SOW") that spelled out each side's obligations, performance timelines, and ultimate objectives.

**B.     The Master Professional Services Agreement and Statement of Work**

51.     Under the MPSA and SOW, Open and the City agreed to implement the Open SmartFlex software product for the City's broadband and utility systems.

52.     The parties worked jointly to create the project timeline reflected in Section 5 of the SOW, which created dual tracks for implementation of the broadband and utilities software solutions, each with dedicated staff from both parties.

53.     As set forth in Section 6 of the SOW, the City acknowledged for both tracks and for each phase of implementation that the "staff estimated to be required for execution of th[e given] process is defined on the staffing matrix" appended to the SOW; likewise, in Section 13.1, the City agreed that it "must have assigned the necessary human and technical resources, according to the staffing matrix" to carry out the project.

54.     Furthermore, the City was primarily responsible for configuration (i.e., providing parameters and business rules for the software's operations), data migration and conversion from the City's legacy utility software, and integration of the new software with existing systems. *See* SOW §§ 3.2, 4.2.3.2, 5.2, 6.3.

55.     Because configuration would guide the entire project, before work could begin, the City committed in Section 13.4 of the SOW to "provide the documentation and specifications" to configure the project.

56.     In the same section, the parties acknowledged that this "information [was] relevant to determine the configuration of the Software and the modules that need to be used for the integration with the platforms," and the parties noted that the project timeline "assum[ed] the required documentation would be available" several weeks before work could begin.

57.     In short, the timeline assumed that the City would execute on its deliverables for both tracks and provide the staffing necessary to do so.

58.     The parties agreed to "cooperate to establish, document and carry out their respective obligations under each SOW," and the City "acknowledge[d] that it is essential for Open's performance of its obligations . . . to provide, and that it reasonably provide, to Open timely responses, cooperation and access to its facilities."  MPSA § 3.1.

59.     The parties recognized the importance of the continuity in the project's management, and each agreed to appoint a project manager, that each project manager "will have authorization for decision-making as to written change requests involving operational issues," and that either party must notify the other if it changed its project manager and provide the name of the replacement project manager to the other party. *Id.* § 3.2.

60.     Recognizing the magnitude and scope of the project, as well as the need for significant coordination and cooperation, the parties expressly agreed that they would "cooperate in good faith, and as reasonably necessary to meet the obligations in the SOW," to "use reasonable efforts to mitigate the duration of, and costs arising from, any suspension or delay in the performance of the Consulting Services," and that the "Project Schedule may be changed to reflect any reasonable additional costs and expenses that Open will incur as a result of any suspension in the provision of the Consulting Services requested in writing by [the City] in accordance with this Agreement." *Id.* §§ 4.1–4.3.

61.     Due to the complexity of the project, the parties contemplated the need for project changes and provided a process to be followed in such instances. *Id.* §§ 6.1–6.3.

62.     The City agreed to pay all invoices within thirty days of the invoice date and a late fee of "the lesser of:  (i) one percent (1%) per month; or (ii) the maximum legal rate allowed by the State of Colorado."  *Id.* § 8.2(g).

63.     The parties agreed that the City could retain 10% of each invoice and that such retainage would be released after the Acceptance Date, as defined in the MPSA. *Id.* § 8.2.

64.     The parties agreed that either "may terminate this Agreement if the other Party fails to perform any of its material obligations under this Agreement and such failure is not cured

within thirty (30) days after receipt of written notice thereof from the non-defaulting Party." *Id.* § 13.2.

65.    The parties further agreed that, if Open terminated the MPSA pursuant to section 13.2, the City "shall pay Open in full for all Services performed by Open prior to the effective date of termination." *Id.* § 13.6.

## C.    The City Breaches the MPSA from the Outset

66.    The parties initially anticipated that the "implementation plan [would] be a 13-month period with an additional 4-month post-go-live support period." SOW at § 5.2.

67.    However, the City acknowledged in multiple memoranda and meetings that it had unilaterally shifted project priorities and failed to uphold its responsibilities, thus breaching the MPSA and causing delays and cost overruns.

68.    Eighteen months into the project, one City official identified five key problems the City was causing—(i) inadequate staff resources, (ii) undefined requirements, (iii) absent business-decision leaders, (iv) no coordination between IT projects in utilities, and (v) inadequate City budget—and warned that the City was violating the MPSA and could face legal action as a result.

69.    Likewise, a June 2020 memorandum to the City Council cited delays and cost overruns because the City's initial schedule "was unrealistic" given the City's resources, including "[i]nitial project management [that] was insufficient with several turnovers of the City's Project Manager" and "critical skilled staff turnover within City IT and Utilities Customer Connections."

70.     Another City official acknowledged that the large scope of the project and "the complexity of configuring a system for a business that was new and undefined made the 12-month plan unrealistic in hindsight," particularly when the City added "new processes and products [including] video to the product offering," all of which "required significant time and rework as the processes and product configuration were developed."

71.     Accordingly, the official for the City admitted that the bulk of fault "lies on our side," and that Open had done "nothing significant, nothing major" to contribute to those problems.

### i.     The City Fails to Satisfy Its Staffing and Project Management Obligations

72.     During the contract negotiation process, the parties agreed that hands-on project management by both sides would be essential to the project's success.

73.     The City, however, lacked personnel with the required leadership and technical experience and consequently agreed to issue an RFP to hire an external project manager, with experience implementing CIS solutions.

74.     This was the first of dozens of unfulfilled staffing promises by the City.

75.     The City did not hire a qualified project manager, instead appointing a city employee who lacked the requisite knowledge, experience, and leadership competencies and served the project only on a part-time basis.

76.     The City likewise failed to retain a project administrator, as required by the MPSA, for the first four months of the project.

77.     The City's contractually required project sponsor also lacked authority over the teams she managed.

-23-

78.     These combined failures of City leadership made communication and coordination impossible.

79.     In effect, Open received uncoordinated input from four separate teams within the City—IT, broadband, utilities, and customer connections—because City leadership failed to communicate internally or implement an accountability structure.

80.     Open identified these problems for the City from the start and discussed them extensively with City executives, including the CIO, the CFO, the City Manager, and the executive directors for broadband and utilities.

81.     While they welcomed Open's feedback and partnership and acknowledged the City's failure to properly staff the project and coordinate City responsibilities, they did not address those problems; instead, they asked Open to be patient and promised corrective actions that never came.

82.     These initial staffing problems only accelerated in mid-2019 when the City's CIO resigned and was replaced by an interim CIO drawn from the City's existing staff.

83.     Later that year and after repeated requests by Open, the City replaced its original project manager with Dr. Michelle Frey, who wielded the competencies, skills, experience, and authority that had been lacking from the City's leadership.

84.     After extensive due diligence, she identified the City's deficiencies on preparation for the project, processes and procedures, staffing, leadership and governance structure, and budget, and she recommended realignment of staffing to support the project and implementation of new processes and procedures by the City to coordinate its obligations under the MPSA.

85.     Alongside Open's project manager, Dr. Frey analyzed the project to date and concluded that project delays were largely the City's fault and agreed the City was responsible for at least 80% of extra project costs.

86.     After only a few months on the job, however, Dr. Frey resigned as project manager, and the City appointed its third project manager in barely a year, which required extensive onboarding from the management counterpart on Open's team.

87.     In the process of training Dr. Frey's replacement, Open quickly determined that the City's third project manager lacked the experience, skills, and leadership competencies to manage the project; a fourth project manager would eventually replace him.

88.     As a result of absent leadership by the City, several other key City staff quit the project during this time.

**ii.     The City Fails to Scope the Project and Breaches Its Configuration, Conversion, and Integration Obligations**

89.     Separate from its failure to live up to its staffing and management obligations, the City had not laid the necessary groundwork to start the project.

90.     Despite the City's urgent desire to begin implementation of the broadband software, the City had not yet obtained critical information for the broadband platform; indeed, the City had not even executed necessary contracts with broadband providers and still had not done so nine months after the project began.

91.     Relatedly, the City breached its configuration obligations by failing to provide specifications for the broadband software, without which Open could not even *begin* to set up the system, nor the integrations to enable broadband services for the City.

92. This not only breached a material contract obligation, but it also forced Open to take quick action that was then wasted.

93. The City's failure to carry out its project obligations continued after the start.

94. According to the project timeline, the City's configuration duties should have been started in early 2019, but by then the City hadn't even completed the prerequisite business definitions for utilities and broadband needed to begin configuration, an unsurprising consequence of the City's leadership and management vacuum.

95. By March 8, 2019, the City's failure to fulfill its obligations, and in particular, the delay in the configuration, led the City to pause all the activities related to utilities implementation and dedicate all resources to broadband in order to expedite delivery of that functionality.

96. This workaround was not a solution, however, because it led to duplication of effort and other inefficiencies that cost time and money and resulted in even more work for City staff and worse delays later.

97. The City had to develop business definitions, test case definitions, and, at the same time, adjust the existing configuration, while also working on the configuration of new products and processes.

98. In effect, the City had to plan and configure the project even as implementation was underway, leading to unnecessary reworking.

99. Inexplicably, despite acknowledging these fundamental problems, the City allocated no additional resources to the project.

**D.      Open Successfully Launches Broadband and the City Praises Its Performance**

100.    Amid all these problems, Open delivered the broadband software solution and demonstrated it extensively, screen by screen.

101.    The City accepted Open's delivery and issued payment, and broadband was officially launched in summer 2019.

102.    Open demonstrated, and the City agreed, that 96.4% of Open Smartflex functionality was delivered for broadband.

103.    However, the City had failed to configure the full product catalog and the business processes.

104.    In fact, the City had configured only 10.5% of internet products, 20% of phone products, and 0% of TV products.

105.    But in light of promises made to Fort Collins residents, the City preferred to launch a product for which it had not completed its work.

106.    A few months later, the City's executive director for broadband touted Open's successful delivery of Smartflex during the industry event Cloud for Utilities in Washington, D.C.

107.    The executive director described the rigorous software selection process the City employed before choosing Open and highlighted the ease of use, advanced user interface, flexibility and configurability, and other key benefits that Open's Smartflex solution had brought to the City.

**E.      The City Fails to Rectify Staffing and Other Breached Obligations, Stalling the Project Throughout 2020**

108.    With broadband launched, albeit without proper configuration, the City turned its attention back to utilities implementation in September 2019—about seven months behind schedule.

109.    Because the City still had so much work to complete in relation to broadband, City staff was diverted from utilities implementation and struggled to provide first-level support, forcing Open to take on City responsibilities, shoulder extra work, and bear extra costs.

110.    In early 2020, the City attempted to right the ship with new leadership and additional resources.

111.    Mike Beckstead, the City's former CFO, was assigned to the project and led negotiations to amend the MPSA, augment City staffing resources, impose new accountability and governance structures for the City's team, and onboard additional staff from Open to fill gaps in the City's capabilities.

112.    In April 2020, Open delivered to the City an updated version of the Functional Matrix that guided the parties' performance and included acceptance criteria and the AS-IS Business Cases ("BC") and Test Cases ("TC").

113.    Consistent with the SOW, the City should have used Open's AS-IS BCs and TCs as a baseline to assist in producing the City's specific TCs and BCs for solution testing and acceptance.

114.    The City was responsible for reviewing the Functional Matrix and ensuring that all BCs and TCs required to test and accept the product were defined and written.

115.     The City assured Open in multiple working sessions that the TCs included in the system testing plan were the ones that covered the City BCs and processes, but Open later discovered that the City not only did not follow the methodology agreed in the SOW, but also failed to produce a complete set of BCs and TCs, leading to further delays in the project.

116.     Testing for utilities was slated to start in May but had to be delayed a month because the City had failed to accomplish the prerequisites for testing—business process definitions, configuration, documented and defined BCs and TCs, and integration developments.

117.     In May 2020, Mr. Beckstead agreed that the City bore responsibility for delays and cost overruns but asked Open to share nearly half of the added costs required to complete the project, noting the difficulty of justifying extra cost to the City Council and residents.

118.     Showing commitment to its partnership with the City and good faith in carrying out the project, Open agreed to this arrangement, in part as an investment in its brand in the broader market.

119.     But even as Mr. Beckstead's leadership showed promise, the City's efforts were plagued with inconsistency.

120.     During May of 2020, the project sponsor and deputy director for customer connections, the executive director for utilities, and the deputy City manager resigned.

121.     Mr. Beckstead was not far behind.

**i.      The City Admits Its Breaches Amid Efforts to Amend the MPSA**

122.     Building on recommendations of Dr. Frey, Mr. Beckstead and Open settled on an amendment to the MPSA on June 2, 2020 ("First Amendment").

123.    The First Amendment established new milestone dates for the project schedule and formalized the cost-sharing agreement that Open agreed to.

124.    In addressing the additional costs called for under the First Amendment, City officials explained to the City Council that the bulk of responsibility for delays and cost overruns "lies on our side," and that Open had done "nothing significant, nothing major" to contribute to those problems.

125.    Mr. Beckstead admitted that sustained staffing shortages and "substantial turnover in project management on the City side" had caused the City to "mov[e] around product offerings and product configurations," which in turn "impacted continuity of effort [and] continuity of focus."

126.    According to Mr. Beckstead, the City had "underestimated the complexity of standing up a business that we were new to."

127.    Nevertheless, Open had developed solutions to the City's ongoing problems, assigned additional Open staff to cover functionalities that the City should have but could not perform, and absorbed significant costs to keep the project moving forward—all efforts that Mr. Beckstead "applaud[ed] and appreciate[d]."

128.    Looking ahead, he conceded to the City Council that there was "still some uncertainty" about the City's ability to adequately staff the project because the City was "still struggling with resources," which he identified as "the biggest risk we face," even after Open agreed to dedicate its own personnel to fulfill City functions.

129.    A memorandum to the City Council around the same time put it plainly: "there is a potential for future risks, primarily related to employee turnover and illness," so "there is a

degree of risk to meeting the" new deadlines, and there may "need[] to be an extension of the project" again.

130.    In response, Councilmember Cunniff—a computer engineer—worried that the City "still [did]n't necessarily have [its] requirements nailed down" and that the City's failure to provide management, staffing, and scoping for the project would mean "we [won't] actually get a billing system at the end of all this."

###    ii.    The City Fails to Meet Its Obligations Under the First Amendment

131.    Regardless of the Council's concerns and Mr. Beckstead's best intentions, the City still refused to assign adequate resources to the project, so delays and costs continued to mount.

132.    In June 2020, the City started the testing process, even though it still had not completed the prerequisite steps to do so.

133.    Ignoring Open's advice, the City decided to start testing in spite of reaching only 79% of compliance pre-test requirements, insisting it could finish the BCs, TCs, and configuration while executing the testing.

134.    The City, once again, failed to execute on their commitments, as their staff was overwhelmed trying to accomplish so many tasks at once.

135.    Toward the end of summer, as it realized it hadn't planned appropriately to build the required TCs (even while failing to complete the TCs it *had* planned for), the City again decided to delay the launch date for the utilities product, from October 2020 to January 2021.

136.    The City simply refused to assign adequate resources to support the mounting needs of the broadband operation and the utilities implementation.

137.     Shortly after the delay was announced, Mr. Beckstead resigned, and the City appointed Travis Storin as interim CFO and Kevin Wilkins and Theresa Connor as new project sponsors.

138.     This reversion to a "committee structure," without clear decisionmakers or lines of accountability, troubled Open, and it cautioned the City that this would be a step backward.

139.     City executives insisted they would make it work. Again, that proved to be wrong.

140.     On September 30, 2020, Open asked the City to set working sessions to review the acceptance level according to testing results in order to understand how the Functional Matrix requirements were progressing from the testing perspective, but the City responded that it wanted to do this review by itself.

141.     In November 2020, the City appointed a "program manager"—a new role meant to backstop the third project manager for the City, who did not have the skills, experience, and leadership for this project.

142.     The program manager quickly announced the City's decision to pause utilities implementation (again) and to assign all the staff and resources to broadband (again).

143.     Open advised the City that this decision, without a well-defined scope and a structured plan, would certainly lead to more delays and more cost.

144.     The City stated that they did not have the required staff to work simultaneously on utilities implementation and deployment of new broadband products, and that broadband was the priority.

145.    The City committed to define the scope for the "Pivot to Broadband" as a list of prioritized item issues which would include what the City deemed necessary to adjust the current processes and products and the new broadband products to be configured and deployed.

146.    The City confirmed that it was aware of its staff limitations, too, and committed to ask Open for help where needed.

147.    The City also decided to implement Agile methodology for the broadband project.

148.    Open warned that a new project methodology so late in the game would result in further delays, but the City proceeded with it nonetheless.

### iii.    The City Praises Open's Product and Partnership

149.    Amid all this, City leaders presented Open Smartflex at the TMG Virtual Utility Forum in fall 2020, one of the most important events in the industry, and described the product as a success story for the City and praised the benefits it was bringing to the City.

150.    The City's broadband director recounted Open's "successful launch" of the City's broadband utility in August 2019, after only ten months on the job, and noted that "a lot of integrations"—covering roughly 20 different software systems—"were required for this system to work, and Open Smartflex was up to the task."

151.    He focused, in particular, on the flexibility of Open's product, explaining that the City is "always going to be adding new products, so having a system that was highly configurable and easy to add new products was very important for us, and Open Smartflex has that capability."  He continued, "This has been a great adventure for us; it's still going on; it's gonna go on for a long time because we have a system that can grow with us and we'll always be able to play with it and tweak it."

152.     After more than two years of collaboration and barely six months before purporting to terminate the MPSA, the City told the world "Open Smartflex is the right tool for us."

**F.      Open Agrees to One Final Reset Attempt by the City with Project Change Request 29**

153.     In December 2020, the City and Open formalized Project Change Request 29 ("PCR29") to pay for Open services performed after the planned launch date for the utilities product, which the City had again postponed.

154.     The City was still working on defining the scope for the "Pivot to Broadband" without involving the Open support team, but it committed to deliver a list of broadband issues with deliverable milestones to Open by January 15, 2021.

155.     The City also committed to deliver by February 5 an updated project plan to finish the utilities implementation, essential for Open to perform and quote the remaining work.

156.     Open agreed to collaboratively develop this workplan with the City project leadership.

157.     As had happened so many times before, the City's deadline came and went without action.

158.     Without priority items for broadband stabilization and utilities implementation, Open reiterated the enormous risks the project was facing during a meeting of the Project Steering Committee.

159.     The City finally asked Open in writing for help on "Pivot to Broadband" and the utilities implementation.

160.    The City provided Open another preliminary list of the broadband issues, but this undeveloped list did not include the guidance the City was obligated to provide and that Open needed to proceed.

161.    Nevertheless, Open agreed to "find what was useful" in the list and work with that, as a sign of good faith to help the City.

162.    Around this time, the City's third project manager resigned and was replaced with an expert hired from an industry consultancy.

163.    At this point, the project was effectively frozen by the City's dithering, with the City pausing utilities implementation for roughly three months, failing to define the scope for the "Pivot to Broadband," and waiting on the results of its new project manager's assessment.

164.    Given this, Open asked the City for an extraordinary, on-site executive meeting, involving the Steering Committee, Open's CEO, and the City Manager, to review the current situation, reaffirm the good-faith partnership between Open and the City, and define the next steps forward.

165.    During that productive meeting, the City reaffirmed its partnership with Open, introduced the new project manager, highlighted recent improvement in the day-to-day operations, and identified progress on the broadband scope definition and the utilities plan consistent with PCR 29.

166.    Open reiterated the importance of completing testing and approving the self-service solution for broadband users, which had been awaiting approval for months.

167.     Open also insisted that "owners" be appointed for the City's broadband and utilities projects to ensure priority issues were identified and that the project manager be assigned full-time to the project with decision-making authority, but the City balked.

168.     By May 20, 2021, the fourth project manager acknowledged that the broadband issue list required by PCR 29 was incomplete and disorganized and was not ready for Open's action.

**G.     Open Notifies the City of Default and the City Promptly Purports to Terminate and Withholds Payment Due to Open**

169.     The project could not be completed without adequate input and cooperation from the City.

170.     Accordingly, on May 19, 2021, Open sent the City a Notice of Default outlining the City's breaches of the MPSA and warning that, consistent with Section 13.2, Open would terminate the MPSA if the City failed to cure its breaches within 30 days.

171.     The City did not cure its breaches.

172.     Instead, the City tried to dump Open before Open dumped the City.

173.     The City had repeatedly acknowledged its fault for delays and cost overruns, but faced with Open's notice of default, the City sent its own "Notice of Dispute and Notice of Termination" a few days later, skipping the required notice of default and cure-period and moving straight to termination, in violation of the MPSA.

174.     While the City purported to terminate the MPSA, it simultaneously demanded that Open continue to provide services for the broadband software system, without payment or the sort of scoping and planning that had prevented Open from providing those services prior to the City's notice of termination.

175.     Nevertheless, Open sought to resolve its dispute with the City, if at all possible, so it met with the City in late June and, in response to the City's request, prepared a long and detailed proposal for completing the project.

176.     Open once again agreed to share the costs for completion and waived any payment until the project was complete.

177.     But the City shunned Open's good faith proposal without explanation and filed suit instead.

178.     The City presently is withholding roughly $1.1 million in retained fees from invoices that otherwise have been paid, more than $2.3 million for other completed work that already has been approved, and approximately $1.8 million in other work performed and not yet invoiced.

179.     This does not account for nearly $1.4 million dollars in additional costs that Open shouldered in an agreement to complete the project with the City despite the delays and other problems caused by the City.

180.     With completion foreclosed by the City, those extra costs are a total loss to Open.

181.     At base, the City hired Open to develop a sophisticated, comprehensive software solution for its utilities and broadband services, but the City refused at every turn to dedicate required resources to the project and to provide the information Open needed to tailor the software to the City's systems and needs.

182.     The City has caused its own predicament, and by failing to meet its contractual obligations, the City has caused more than $6.3 million in damages to Open, even after applying roughly $300,000 in credits.

183.    Open is entitled to be made whole.

## COUNTERCLAIM ONE
### (Breach of Contract)

184.    Open incorporates the preceding allegations as though fully set forth in this Counterclaim One.

185.    The MPSA, including all amendments thereto, is a valid and enforceable agreement between Open and the City.

186.    At all relevant times, Open complied with its obligations under the MPSA and worked in good faith to carry out the project.

187.    The City, however, has committed multiple breaches of its obligations under the MPSA, including, but not limited to:

a.      failing to assign adequate staff resources for the project's execution, as required by Section 13.1 of the SOW;

b.      failing to appoint and retain mandatory leadership roles, as required by Section 3.2 of the MPSA and Sections 4.2, 6, and 13.1 of the SOW;

c.      failing to comply with project requirements and timelines, including as to its configuration, conversion, and integration obligations pursuant to Sections 3.2, 4.2.3.2, 5.2, and 6.3 of the SOW;

d.      failing to deliver to Open by January 15, 2021, a complete prioritized list of the broadband issues yet to be resolved, as required by PCR 29;

e.      failing to deliver to Open by February 5, 2021, an updated project plan for utilities, as required by PCR 29;

f.      failing to timely pay all invoices and other obligations due pursuant to the terms

of the MPSA; and

g.      improperly terminating the MPSA.

188.    The City's breaches have resulted in actual damages to Open in an amount to be

proven at trial, but not less than $6.3 million, plus attorneys' fees, costs, and interest.

**COUNTERCLAIM TWO**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

189.    Open incorporates the preceding allegations as though fully set forth in this

Counterclaim Two.

190.    The MPSA, including all amendments thereto, is a valid and enforceable

agreement between Open and the City.

191.    In every agreement, there is an implied covenant of good faith and fair dealing.

192.    Under the MPSA, Open reasonably expected that the City would provide

adequate staffing, including a competent project manager and project sponsor at all times, and

that the City would fully cooperate with Open to identify the needs of the City and provide the

information necessary to implement Open Smartflex with the City's existing systems and data.

193.    The City breached the implied covenant of good faith and fair dealing, including

by failing to:

a.      assign adequate staffing at all times capable of fulfilling the City's contractual

obligations, including a competent project manager and project sponsor;

b.      cooperate with Open's efforts to advance the project;

c.      abide by project priorities, timelines, and scope;

d.    supply information necessary to implement Open Smartflex with the City's

existing systems and data; and

e.    follow notice-and-cure protocols before terminating.

194.    The City's conduct has prevented Open from enjoying the fruits of its bargain

under the MPSA.

195.    The City's breaches of the implied covenant of good faith and fair dealing have

resulted in actual damages to Open in an amount to be proven at trial, but not less than

$6.3 million, plus attorneys' fees, costs, and interest.

### COUNTERCLAIM THREE
### (Declaratory Judgment)

196.    Open incorporates the preceding allegations as though fully set forth in this

Counterclaim Three.

197.    The MPSA, including all amendments thereto, is a valid and enforceable

agreement between Open and the City.

198.    The MPSA required the City to provide adequate staffing and to lead

configuration, conversion, and integration for the project, which were conditions precedent to

Open's complete performance under the MPSA.

199.    The City did not provide adequate staffing and did not timely comply with its

configuration, conversion, and integration obligations, and it unilaterally altered material aspects

of the project.

200.    As a result, although Open performed all of its contractual obligations that had

come due, the project was delayed.

201.     The City contends that it performed its obligations and that Open failed to perform when its own obligations came due, and the City is therefore withholding payments due to Open and demanding rescission and reimbursement from Open.

202.     Accordingly, Open seeks a judicial declaration, stating that Open performed its express and implied contractual obligations or was prevented from performing those obligations by virtue of the City's preceding breaches of the MPSA and other conduct and that Open therefore is not liable to the City for breach of any contractual obligation of any kind, which will terminate a controversy and remove uncertainty as between the parties to this counterclaim who are the relevant parties to the contract in dispute.

## REQUEST FOR RELIEF

WHEREFORE, based on the foregoing allegations and counterclaims for relief, Counter-Plaintiff Open International, LLC requests that the Court enter judgment as follows:

1.     On Counterclaim One, damages in an amount to be proven at trial, but not less than $6.3 million, plus attorneys' fees, costs, and interest.

2.     On Counterclaim Two, damages in an amount to be proven at trial, but not less than $6.3 million, plus attorneys' fees, costs, and interest.

3.     On Counterclaim Three, a declaration that Open fully performed its obligations as they came due and that any failure to fully perform the MPSA is a result of the City's preceding noncompliance with and material breaches of the MPSA.

3.     Pre- and post-judgment interest.

4.     Such other and further relief as the Court deems just and proper.

Dated: August 27, 2021.

Respectfully submitted,

_/s/ Paul D. Swanson_

Paul D. Swanson
Hannah E. Armentrout
HOLLAND & HART LLP
555 17th Street, Suite 3200
Denver, CO 80202
Ph: (303) 295-8000
pdswanson@hollandhart.com
hearmentrout@hollandhart.com

**ATTORNEYS FOR DEFENDANTS**
**OPEN INTERNATIONAL, LLC AND OPEN**
**INVESTMENTS, LLC**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 27, 2021, I have caused to be electronically filed the foregoing with the Clerk of Court using the CM/ECF.

*s/ Paul D. Swanson*