IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:21-cv-02063-CNS-MEH

CITY OF FORT COLLINS, a Colorado home rule municipality,

     Plaintiff,

v.

OPEN INTERNATIONAL, LLC, a Florida limited liability company and
OPEN INVESTMENTS, LLC, a Florida limited liability company,

     Defendants.

---

## ORDER

---

This matter is before the Court on Defendants' Motion for Partial Summary Judgment (ECF No. 125). For the following reasons, the Court DENIES the motion. Also before the Court is Plaintiff City of Fort Collins' Motion for Summary Judgment (ECF No. 124). For the following reasons, the Court DENIES IN PART and GRANTS IN PART the motion.

## I.  UNDISPUTED MATERIAL FACTS

In 2017, voters in the City of Fort Collins (the City) approved an amendment to the Fort Collins City Charter to allow the City to provide telecommunications services, including broadband internet facilities, to its residents (ECF No. 124, ¶ 2).

On February 10, 2018, the City issued a Request for Proposal 8697 for "Vendor Selection and Implementation of a Comprehensive Solution for Utilities/Broadband Billing (CIS/OSS)" (the RFP), seeking an integrated software solution that would provide functionality to the City's

1

Customer Information System (CIS) and field services, and also would serve both the City's existing utilities and its new municipal broadband service (ECF No. 124, ¶ 3; *see* ECF No. 125, ¶ 1). The RFP included a "functional requirements matrix" with approximately 2,000 desired software functionalities, and it instructed applicants to assign each functional requirement listed by the City with a letter grade between A–G based on the status of the applicant's software (ECF No. 125, ¶ 2; ECF No. 156, ¶¶ 80, 81). The RFP emphasized the importance of grading the functional requirements matrix "accurately and factually" (ECF No. 156, ¶ 79), and also stated the City's "preference . . . that a Comprehensive Solution has a go-live date of July 2019," (ECF No. 125, ¶ 4).

Open International, LLC and Open Investments, LLC (collectively, Open) responded to the RFP, acknowledged that the City sought an integrated solution, and claimed that it could "compl[y] with the vast majority of the functional and technical requirements of this RFP with one single uniform product: Open Smartflex" (OSF) (ECF No. 124, ¶ 5). Open also claimed that it could implement OSF in two phases—the first would take "12 months with a three month post-go-live support period" and the second would "occur one month later [and] have four months post-go-live support" (*id.*).

Ultimately, the City selected Open as its vendor, and on August 9, 2018, the City and Open executed the Master Professional Services Agreement (MPSA) and Statement of Work (SOW) (ECF No. 124, ¶ 7; *see* ECF No. 124-4). Under the MPSA, the parties agreed that the City's RFP and Open's Response were incorporated by reference and that the MPSA, including all exhibits, was fully integrated (ECF No. 124, ¶ 8; ECF No. 125, ¶¶ 14–17). Further, under the SOW, Open agreed to deliver OSF for the City's new broadband service (Broadband Go-Live) by June 2019

and, for the City's other utilities (Utilities Go-Live), by mid-September 2019 (ECF No. 124, ¶ 9; ECF No. 125, ¶ 18). The OSF project's total completion date was slated for January 2020 (ECF No. 125, ¶ 18). The parties agreed upon six "milestones" to measure project progress and trigger payment: contract signing and delivery of software, initiation and planning, solution scope presentation, Broadband Go-Live, Utilities Go-Live, and utilities stabilization (*id.*, ¶ 19).

Pertinent to the parties' respective motions, the MPSA also includes the following provisions:

> § 6.3 Documenting a Change. Any operational change to a Project described in a SOW must be documented in a change order form executed by each Party's authorized representative.

> § 12.1 Limitations of Liability. NEITHER PARTY SHALL BE LIABLE FOR (A) ANY PUNITIVE, SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING LOSS OF USE, DATA, BUSINESS, OR PROFITS), REGARDLESS OF THE THEORY OF LIABILITY OR WHETHER THE LIABLE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES; OR (B) AGGREGATE DAMAGES IN EXCESS OF THE FEES PAID OR PAYABLE BY CUSTOMER UNDER THIS AGREEMENT DURING THE TWELVE (12) MONTHS PRIOR TO THE EVENT GIVING RISE TO LIABILITY.

> § 13.2 Termination for Default. [E]ither Party may terminate this Agreement if the other Party fails to perform any of its material obligations under this Agreement and such failure is not cured within thirty (30) days after receipt of written notice thereof from the non-defaulting Party. Any notice of default provided under this Agreement shall specify: (a) the nature of such default and (b) the specific act or acts which the non-defaulting party contends would, if undertaken, correct such default.

> § 13.5 Consequences of Termination by Customer for Default. If Customer terminates this Agreement under Section[] 13.2, . . . (a) Customer shall have no obligation to Open, except to pay for additional licenses delivered but not paid, and for Services accepted by Customer prior to termination. Open will cease performance of the Services immediately upon receipt of written notice of termination; [and] (c) Customer may employ any other qualified person, firm, or corporation to finish the work that was to be completed by Open, and Customer may recover from Open the reasonable cost of such completion, not to exceed one

hundred ten percent (110%) of the costs that would have been payable to Open for such completion, and subject to Section 12 (Limitations of Liability).

§ 13.6(a) Consequences of Termination by Open for Default. If Open terminates this Agreement under Section[] 13.2, . . . Customer shall pay Open in full for all Services performed by Open prior to the effective date of termination.

§ 17.1 Informal Dispute Resolution. The Parties will use reasonable efforts to resolve any disputes under this Agreement through negotiation. If a dispute arises between the Parties, the Project Managers will first strive to work out the problem internally. If the Project Managers are unable to resolve the dispute within thirty (30) days of commencing negotiations, then either Party may deliver a written notice in accordance with Section 18.5 (Communication and Notice Protocol) to the other party describing the nature and substance of the dispute and proposing a resolution (the "**Notice of Dispute**").

§ 17.2 Executive Negotiation. During the first ten (10) days following the delivery of the Notice of Dispute . . . an authorized executive of each Party shall attempt in good faith to resolve the dispute through negotiations. . . .

§ 18.4 Amendment and Waivers. Any term or provision of this Agreement may only be amended or waived by the Parties' express written agreement. Email and other electronic communications shall not be deemed to be a "written agreement" under this provision. The delay or failure of a Party, at any time or from time to time, to require performance of any obligations of the other Party will not be deemed a waiver and shall not affect its right to enforce any provision of this Agreement at a subsequent time.

§ 18.5(b)(i) Formal Communications. Written correspondence is required whenever an exchange of information or an official response is need[ed] from a receiving party as to any project related matter, including changes to delivery schedules, scope of work, and coordination with subcontractors or other parties that will affect performance by the transmitting party.

§ 18.5(b)(ii) Informal Communications. [I]nterpretation or amendment of the Parties' duties under this Agreement shall only occur through formal communications and mutually-approved change orders.

(*See* ECF No. 124, ¶¶ 13, 15, 16, 17; ECF No. 125, ¶¶ 21, 22; *see also* ECF No. 124-4 at 10, 13, 14, 16, 17, 18).

Between 2018 and 2019, Open performed services for the first four project milestones—contract signing and delivery of software, initiation and planning, solution scope presentation, and Broadband Go-Live—for which the City approved and paid Open's invoices (ECF No. 125, ¶¶ 25, 28, 29; ECF No. 154, ¶ 33). Further, over the course of the OSF project and pursuant to the terms of the MPSA, the parties negotiated and executed between 29–30 project change requests (PCRs) concerning additional costs or resources and extension of the project schedule (*see* ECF No. 124, ¶ 18; *see also* ECF No. 154 at 5–6, ¶ 18).[1] But beginning in fall 2019, the parties began rescheduling the remaining utilities-related milestones and negotiating responsibility for project delays, costs, and "deficiencies on both sides" (ECF No. 125, ¶ 39; *see id.* at ¶¶ 40, 41, 49, 57, 58, 59). The parties exchanged lists of problems and delays which they believed were attributable to the other party (ECF No. 125, ¶¶ 39, 40, 41, 49).

Following these negotiations, on June 2, 2020, the parties executed the First Amendment to the MPSA, acknowledging that "multiple factors have led to the extension of the Utilities Go-Live milestone date . . . and additional cost[s] of $3,066,117.60 to complete the project," and agreeing to divide this additional cost between them (ECF No. 124, ¶ 19; *see* ECF No. 124-8 at 1). The City's cost-share equaled 55% of the total additional cost, and "in recognition both Parties share responsibility for the issues driving the revised project schedule and added cost, Open . . . agreed to absorb 45%" of the total additional cost (ECF No. 128-4 at 1).

The Amendment set forth three new milestones—First Amendment signing, appropriation in summer 2020, and completion of utilities testing in September 2020—as well as payment

---

[1] The City contends that the parties executed 29 PCRs, and "also drafted PCR No. 10, but it was not fully executed." In contrast, Open states that the parties 30 PCRs, "including PCR No. 10 that the City asserts was not executed." This dispute, in any event, is not germane to the motions at issue.

amounts for each milestone (ECF No. 125, ¶ 62; *see* ECF No. 124-8, § 2–3). Open invoiced the City for the first two milestones under the First Amendment, which the City paid on July 30, 2020 (ECF No. 125, ¶ 64).

In December 2020, the City paused utilities implementation to address lingering broadband functionality issues, and it executed PCR 29 agreeing to (i) provide a prioritized list of the broadband issues it sought Open's help to resolve; (ii) develop a new project plan with Open for the completion of the overall project; and (iii) make a payment on signing of PCR 29, and another payment upon resolution of the broadband issues identified in the City's list (ECF No. 125, ¶¶ 68, 69; *see* ECF No. 125-58).

On May 19, 2021, Open served the City with a "Notice of Default pursuant to Section 13.2 of Master Professional Services Agreement" (May 19 Notice) (ECF No. 125, ¶ 73; *see* ECF No. 125-61). The May 19 Notice stated that that City had not delivered a prioritized list of broadband issues or an updated project plan as required by PCR 29, and that it had failed to devote "the necessary human and technical resources" to the project as required by the SOW (ECF No. 125-61 at 1–3). The May 19 Notice also specified that the City had 30 days to cure these defaults (*id.* at 3–4).

In turn, on May 28, 2021, the City served Open with its "Notice of Dispute and Notice of Termination pursuant to sections 13 and 17 of the Master Professional Services Agreement (May 28 Notice) (ECF No. 124, ¶ 24; *see* ECF No. 125-62). As of that date, utilities system testing had not been completed, Utilities Go-Live had not occurred, and utilities stabilization had not been successfully completed (*id.*). The May 28 Notice stated that Open had (i) "made material misrepresentations about the fitness of the Smartflex product for the City's needs in the RFP

Response and the MPSA"; (ii) "made material misrepresentations regarding the implementation process that the City would need to support"; (iii) "significantly underestimated the time to execute the project, missed the initial deadlines, and missed the re-set deadlines"; and (iv) "not provided the required contractual level of support promised in the RFP Response and required by the MPSA" (ECF No. 125-62 at 6–7).

The May 28 Notice further stated that "[a]ttempts to cure the breaches related to the product capabilities, implementation problems, and missed deadlines appear to the City to be futile"— instead, the City demanded that Open provide continuing broadband support until the City could arrange for a new vendor, make a "significant lump-sum payment to the City," forfeit all contract retainage amounts to the City, and execute a mutual release and non-disparagement agreement (ECF No. 125 at 7–8). And citing MPSA § 17.2, the May 28 Notice specified that the Parties had 10 days to attempt to resolve the dispute through executive negotiations before the City would seek recission or contract damages (*id.* at 8).

On July 2, 2021, the City initiated this lawsuit against Open, claiming fraudulent inducement, breach of contract, breach of the implied covenant of good faith and fair dealing, declaratory judgment, and negligent misrepresentation[2] (ECF No. 124, ¶ 25; *see* ECF No. 192). As of that date, the City had paid Open $8,756,659.16 from appropriated funds for the OSF project, and it held $1,086,033.00 in retainage amounts (*id.*; *see* ECF No. 154, ¶ 33).

---

[2] The City's negligent misrepresentation claim was added through its Amended Complaint (*see* ECF No. 192 at 21–23).

Open countersued for breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory judgment (ECF No. 124, ¶ 126; *see* ECF No. 194). Open's claimed damages total $3,826,719.14 (ECF No. 124-14 at 5).

## II.  LEGAL STANDARD

Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Ledbetter v. City of Topeka*, 318 F.3d 1183, 1187 (10th Cir. 2003); Fed. R. Civ. P. 56(a). The factual record and reasonable inferences must be construed in the light most favorable to the nonmoving party. *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006). The moving party bears the initial burden, but once met, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 256 (1986). Ultimately, the Court's inquiry on summary judgment is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. And generally, where a party raises real issues of credibility, motive, or intent, the matter is unsuited for summary judgment. *Baum v. Gillman*, 648 F.2d 1292, 1295–96 (10th Cir. 1981).

## III.  ANALYSIS

### A.  Open's Motion for Partial Summary Judgment (ECF No. 125)

In its motion for partial summary judgment, Open seeks an order of summary judgment in its favor as to the City's fraudulent inducement and breach of contract claims. For the reasons set forth below, the Court DENIES Open's motion as to both claims.

Open also seeks an order of summary judgment in its favor as to its own breach of contract claim. For the reasons set forth below, the Court DENIES summary judgment as to this counterclaim.

### 1. The City's Fraudulent Inducement Claim

Open makes three arguments in support of its contention that summary judgment should enter on the City's fraudulent inducement claim. None of them are persuasive.

First, Open argues that there is no evidence that Open misrepresented an existing fact about Open's product in its RFP Responses. According to Open, it was speaking prospectively about OSF while it was still in development and untested, and Open proposed what OSF functionalities it could deliver by the relevant go-live dates, rather than describing the state of OSF at the time of the proposal (ECF No. 125 at 19–21). The City counters that in its RFP Responses, Open graded many of OSF's actual, *then-existing* functionalities on the functional requirements matrix as "A" (i.e., "No modification is required. Desired functionality is achieved through configuration and is part of the base code") even though those features were nonexistent or still in development (ECF No. 156 at 19–20). "An essential element of fraud is that the misrepresentation relied on must be of an existing or past material fact," *United Fire & Cas. Co. v. Nissan Motor Corp.*, 433 P.2d 769, 771 (Colo. 1967), so a misrepresentation cannot be "a matter of intention," "an unfulfilled promise to perform an act," or "something done in the future," *People v. Orris*, 121 P. 163, 164 (Colo. 1912). But here, the City raises a genuine fact issue as to the nature of Open's representations in its RFP responses—i.e., whether they referred to the then-existing state of OSF, or its promised state by the go-live dates. Summary judgment based on this argument is therefore inappropriate.

Second, Open argues that the economic loss rule bars the City's fraudulent inducement claim. More specifically, Open observes that the MPSA expressly incorporated Open's RFP Responses and disclaimed all other representations, so any of Open's alleged misrepresentations were subsumed by the MPSA (ECF No. 125 at 22–23). *See in re Estate of Gattis*, 318 P.3d 549, 553 (Colo. App. 2013) ("For a claim to escape the economic loss rule, the [tort] duty must exist independently of any contractual obligation."). But notwithstanding the RFP Responses' incorporation into the parties' contract, the City correctly points out that the economic loss rule does not bar claims "based on pre-contractual misrepresentations" which are made "to induce the formation of the contract itself" (ECF No. 156 at 21 (quoting *Levin v. Five Corners Strategies, LLC*, 541 F.Supp. 3d 1262, 1270 (D. Colo. 2021))). Furthermore, the Court agrees that the MPSA's integration clause does not impact whether the economic loss rule applies. An integration clause prevents reliance on prior misrepresentations only when it contains "clear and specific language" concerning the subject of the misrepresentation. *Pensford Fin. Grp., LLC v. 303 Software, Inc.*, No. 1:18-cv-03286-RM-SKC, 2019 WL 20765579, at *2 (D. Colo. May 10, 2019); *see RE/MAX, LLC v. Quicken Loans Inc.*, 295 F.Supp.3d 1163, 1171–72 (D. Colo. 2018) ("[G]eneral integration clauses do not bar claims based on misrepresentations related to contracts."). The MPSA's integration clause contains no such language and, as such, summary judgment based on this argument is inappropriate.

Third and finally, Open argues that the City waived its fraudulent inducement claim by renewing the MPSA and continuing to work with Open even after the City learned the facts underlying the fraud claim (ECF No. 125 at 23–26). The City counters that while it knew about problems with the OSF software and decided to continue with the contract anyway (i.e., by signing

the First Amendment), it had not discovered the root cause of those problems—Open's alleged misrepresentations about OSF's capabilities—until much later (ECF No. 156 at 22–25). "To sustain the defense of ratification and waiver, it must appear that the defrauded party, with full knowledge of the truth respecting the false representations, elected to continue to carry out the agreement." *In re Mascio*, No. 06-cv001780-PSF, 2007 WL 3407516, at *5 (D. Colo. Nov. 13, 2007). This determination appears to involve questions of disputed fact—namely, when did the City discover the misrepresentations tied to OSF's flaws, and did it continue with the contract with full knowledge of Open's misrepresentations. As such, summary judgment based on Open's waiver claim is improper.

Based on the foregoing, Open's motion for summary judgment as to the City's fraudulent misrepresentation claim is DENIED.

### 2. The City's Breach of Contract Claim

> *a. Whether the City breached the contract by failing to comply with MPSA § 13.2's "notice-and-cure" provision—or, conversely, whether compliance would have been futile—is a question of disputed fact.*

MPSA § 13.2 set forth the mandatory, exclusive procedure for one party to terminate the contract due to the other party's default:

> § 13.2 Termination for Default. [E]ither Party may terminate this Agreement if the other Party fails to perform any of its material obligations under this Agreement and such failure is not cured within thirty (30) days after receipt of written notice thereof from the non-defaulting Party. Any notice of default provided under this Agreement shall specify: (a) the nature of such default and (b) the specific act or acts which the non-defaulting party contends would, if undertaken, correct such default.

Here, Open argues that the City's contract claim is barred because it failed to fulfill a condition precedent to the claim—that is, by serving Open with the May 28 Notice, the City

11

terminated without giving adequate notice and opportunity to cure as set forth in MPSA § 13.2 (ECF No. 125 at 26–27). The City counters that its May 28 Notice fully satisfied MPSA § 13.2 or, at the very least, that whether the letter complied with MPSA § 13.2 presents a factual dispute unsuited for summary judgment (ECF No. 25–27). Based on the undisputed contents of both MPSA § 13.2 and the May 28 Notice, the Court agrees with Open that the City's notice failed to comply with the MPSA's termination procedures. Ultimately, though, the Court disagrees with Open's assertion that the City's deficient notice bars its contract-based claims.

Apparently, the City intended for its May 28 Notice to serve as a dual "notice of dispute" under MPSA § 17.1 and a "notice of termination" under MPSA § 13.2. As the City acknowledged in its May 28 Notice, however, the procedures set forth in those subsections are distinct (*see* ECF No. 125-62 at 3). And while the May 28 Notice may have sufficed to invoke the City's rights to dispute resolution under MPSA § 17.1, it lacked the requisite components for the City to wholly terminate the contract under MPSA § 13.2. More specifically, the written notice required for one party to terminate due to the other party's default included identification of the following:

*a.  The nature of the default*. The City's May 28 Notice did identify at least two[3] of Open's failures to perform its material obligations under the parties' contract: (i) Open did not meet the initial deadlines set forth in the MPSA or the new deadlines set forth in the First Amendment, and (ii) Open did not provide the required level of support for the OSF product (ECF No. 125-62 at 8).

---

[3] In a section entitled "Open's Breaches," the May 28 Notice also indicated that Open had made material misrepresentations about (i) the OSF's fitness for the City's needs, and (ii) the extent to which OSF required customization and development before it could be implemented in the United States (ECF No. 125-62 at 7–8). Open claimed that these misrepresentations induced the City to enter into the MPSA in the first instance (*id.*). But, strictly speaking, these claimed "breaches" are unrelated to Open's failure to perform its material obligations *under the MPSA*, as required by MPSA § 13.2.

*b.   The specific act(s) which the non-defaulting party contends would, if undertaken, correct the default*. The City's May 28 Notice set forth demands that purported to serve as both a "proposed dispute resolution" under MPSA § 17.1 and the "specific act or acts" Open could take to cure its contractual defaults under MPSA § 13.2 (*see* ECF No. 125-62 at 8–9). But of the City's demanded acts—i.e., continuing broadband support "during a transition period until the City arranges for a new system," "a significant lump-sum payment to the City," forfeiture of the retainage and any amounts owed on outstanding invoices, and the execution of a mutual release and non-disparagement agreement—none of them would have enabled Open to correct the specific defaults that the City identified (i.e., missed deadlines and inadequate support). The May 28 Notice then invoked MPSA § 17.2's executive negotiation provision, indicating that the parties had 10 days from the notice to settle their dispute (*id.*). It did not, as required by MPSA § 13.2, contemplate a 30-day "notice and cure" period" for Open to come back into compliance with the parties' agreement. Instead, the City claimed that "[a]ttempts to cure the breaches related to the product capabilities, implementation problems, and missed deadlines appear to the City to be futile" (ECF No. 125-62 at 9). As such, the language of the May 28 Notice did not afford Open an opportunity to cure its purported failures to perform its material obligations under the parties' contract as required by MPSA § 13.2.

By demonstrating that the May 28 Notice did not comply with the "notice-and-cure" procedure set forth in MPSA § 13.2, Open may have shown that the City breached the MPSA— but even then, the City's failure to comply with MPSA § 13.2 does not end the inquiry because, as noted above, the City asserted that serving the requisite notice upon Open would have been futile.

"In Colorado, notice of default and right to cure is not required if it would be futile." *Hoppe v. Percheron Assocs.*, LLC, No. 11-cv-03233, 2012 WL 3135378, at *6 (D. Colo. Aug. 1, 2012); *cf. New Design Constr. Co., Inc. v. Hamon Contractors, Inc.*, 215 P.3d 1172, 1180 (Colo. App. 2008) ("[T]he law does not require a party to perform futile acts as a condition precedent to asserting its rights."). Futility requires a showing either that (i) the defaulting party has clearly communicated its intent not to perform its contract obligations, or (ii) the defaulting party would be clearly unable to timely perform its contract obligations even if the requisite notice of default is given. *See Hoppe*, 2012 WL 3135378, at *6; *see also Highlands Ranch Univ. Park v. Uno of Highlands Ranch*, 129 P.3d 1020, 1024 (Colo. App. 2005). Here, the City has made no allegation that Open clearly repudiated the MPSA. The City has, however, raised a genuine fact issue about whether, in view of the parties' efforts to address Open's deficient performance during the previous year, Open would have been capable of addressing the breaches specified in the May 28 Notice within the contractual 30-day cure period (*see* ECF No. 125-62 at 6; *see also* ECF No. 125, ¶¶ 39–41, 49, 57–59). Given this disputed futility question, Open's assertion that the City breached the MPSA as a matter of law cannot be resolved on summary judgment.

On a closely related note, the Court departs from Open's conclusion as to the effect of the City's deficient notice. Here, Open argues that following the MPSA's mandatory, exclusive termination procedure is a condition precedent to a breach of contract claim, so the City's deficient notice bars its contract claim entirely (ECF No. 125 at 26–27). But the authorities Open cites for this proposition do not hold that complying with a contract's notice-and-cure provision is a condition precedent to a party's ability to bring a claim for breach of contract. Rather, they establish only that compliance is a condition precedent to a party's ability to terminate the contract

correctly (i.e., without themselves committing a breach of the contract). *See N.W. Water Corp. v. City of Westminster*, 432 P.2d 757, 760 (Colo. 1967) (noting the parties' agreement that their contract's 30-day notice provision was a mandatory, and holding "that it was a *condition precedent to termination* thereof") (emphasis added); *Carleno Coal Sales v. Ramsay Coal Co.*, 270 P.2d 755, 757 (Colo. 1954) (holding that termination prior to the contract's required notice-and-cure period constituted breach of the contract entitling the nonbreaching party "to at least nominal damages," but was not a total bar to the breaching party's contract-based claims); *CSCP Denver, LLC v. Atlas Real Estate Grp., LLC*, No. 16CV33517, at *14–17 (Denver Dist. Ct. Apr. 28, 2017) (finding that plaintiff's notice did not comply with the notice provisions set forth in the parties' lease, resulting in plaintiff breaching the contract). So, even if the May 28 Notice did not comply with MPSA § 13.2, Open has not established that the City's breach of contract claim is completely barred.

For these reasons, the Court DENIES summary judgment as to the City's breach of contract claim.

> *b.  Whether the City's recovery on its contract-based claims is limited— either by its own conduct, or by the terms of the MPSA—is a question of disputed fact.*

Open argues that even if the City's breach of contract claim is allowed to proceed, its allowable damages are limited as a matter of law for two reasons.

First, Open argues that under MPSA §§ 12.1 and 13.5(c), "the City may recover only its direct damages—i.e., the costs of retaining an alternate vendor to implement a replacement system—and that its recovery is further limited to the lesser of 110% of the MPSA contract price or the total amount paid to Open in the year preceding the 'event giving rise to liability'" (ECF No. 125 at 28). It appears that neither party disputes the applicability of these damages caps under

the MPSA. However, the parties raise a genuine fact issue as to when the "event giving rise to liability" occurred under MPSA § 12.1—Open asserts that the relevant look-back date is July 2, 2021, when the City filed suit, while the City contends that the date is May 19, 2021, when Open sent its May 19 Notice. Accordingly, summary judgment based on Open's damages cap argument is improper.

Second, Open argues that "[t]he City's contract-based claims should be further limited to account for conduct and damages the City affirmatively waived" (ECF No. 125 at 28–29). More specifically, Open asserts that the City waived its claims related to: (i) alleged unsatisfactory services associated with the invoices and milestones the City fully approved and paid for, and (ii) any alleged breaches prior to the City choosing to continue the parties' contract by executing the First Amendment (*id.*). However, for the same reasons set forth above as to the City's fraudulent inducement claim, Open's argument presents disputed factual issues—namely, whether the City intended to accept and pay for Open's services, and whether it intended to continue with the contract, with full knowledge of Open's alleged breaches. *See Copper Oaks Master Home Owners Ass'n v. Am. Fam. Mut. Ins. Co.*, No. 15-cv-01828-MSK-MJW, 2018 WL 3536324, at *16 (waiver is "the intentional relinquishment of a known right" and "requires full knowledge of all the relevant facts"). As such, summary judgment based on Open's waiver argument is improper.

For these reasons, the Court DENIES summary judgment to the extent that Open seeks to limit the City's recovery on its contract-based claims.

### 3. *Open's Breach of Contract Counterclaim*

Open also moves for summary judgment as to its own breach of contract claim. Here, Open asserts that there is no genuine issue of material fact that the City breached the MPSA by

terminating without giving Open notice and an opportunity to cure as required by MPSA § 13.6, and "that breach, in turn, prevented Open from obtaining full payment for the work it had completed and that the City approved" (ECF No. 125 at 30). According to Open, it performed services worth $1,461,262.99 for which the City withheld payment (*id.*)—$1,086,032.59 that the City retained from 10% of all amounts invoiced by Open (*see* ECF No. 124-4 at 376), plus $375,230.40 in ten outstanding invoices that Open submitted and that the City pre-approved (*see* ECF No. 124-14 at 5). As set forth above, however, Open's claim that the City breached the MPSA is not resolvable on summary judgment given the disputed issue of whether the City's compliance with MPSA § 13.2's "notice-and-cure" procedure would have been futile.

Accordingly, the Court DENIES summary judgment on Open's breach of contract counterclaim.

**B.  The City's Motion for Summary Judgment (ECF No. 124)**

Turning to the City's motion for summary judgment, it seeks an order limiting Open's damages under its breach of contract counterclaim. The Court DENIES IN PART and GRANTS in PART, as set forth for each category of Open's claimed damages below.

The City also moves for summary judgment in its favor as to Open's counterclaims for breach of the implied covenant of good faith and fair dealing and declaratory judgment. For the reasons set forth below, the Court GRANTS the City's motion as to both counterclaims.

### 1. *Open's Claimed Damages*

The City argues that even if Open succeeds in proving that the City breached the contract, several of Open's requested damages are either unavailable or limited as a matter of law. The Court will address each category of damages in turn.

a.  Damages for milestones not invoiced or achieved. Open seeks to recover $2,129,561.77 in connection with "services performed and approved, [but] not yet invoiced" at the time the City terminated the contract (ECF No. 124 at 11; *see* ECF No. 124-14 at 5).

The City asserts that for the City to be obligated to pay Open for these services under MPSA §§ 8.2(a)–(g), Open needed to have (i) *achieved milestones* under the parties' agreement (i.e., not just performed work in service of meeting milestones), and (ii) *invoiced the City* for milestones achieved. According to the City, neither of these payment conditions occurred (ECF No. 124 at 11–12). Among other arguments,[4] Open counters that if the City breached by wrongfully terminating the contract, "the City was obligated to make full payment for services Open rendered and for which Open would have received payment if the City had followed the contract, performed its obligations, and the milestones had thus been met" (ECF No. 154 at 19).

If Open succeeds at trial in proving that the City breached the contract by failing to comply with MPSA § 13.2's "notice-and-cure" procedure prior to terminating, and that its compliance was not futile, the jury could award damages for the value of Open's services based on conditions (i.e., the full achievement of milestones, and the submission of invoices) that the City prevented Open from meeting due to its wrongful termination (*id.* at 18–19). *See Copper Creek Inc. v. State Farm Fire & Cas. Co.*, No. 21-cv-01603-NYW-MEH, 2022 WL 17454493, at * 9 (D. Colo. Dec. 6, 2022) (quoting *Montemayor v. Jacor Commc'ns, Inc.*, 64 P.3d 916, 920 (Colo. App. 2002) ("When a promisor is himself the cause of the failure of performance of a condition upon which his own

---

[4] Open also argues that if the City breached the contract, it is entitled under MPSA § 13.6(a) to payment "in full for *all services performed by Open* prior to the effective date of termination," without regard for whether the relevant services were properly invoiced, covered by a written change request, or whether the parties' Acceptance Date occurred (ECF No. 154 at 17–18, 19, 19–21; *see* ECF No. 124-4 at 14). Considering the other arguments presented, the Court declines to decide the applicability of MPSA § 13.6(a) at this time.

liability depends, he cannot take advantage of that failure.")). The measure of damages in such instance would be determined by the jury.

For these reasons, the Court DENIES the City's motion for summary judgment as to Open's claim for the amount of its un-invoiced services.

b.  Damages for unauthorized work. Open seeks to recover $598,300 in connection with personnel services rendered past the extended deadlines set in the First Amendment and PCR 29 (ECF No. 124 at 12–14; *see* ECF 124-14 at 5).

The City argues that for the City to be obligated to pay Open for these services under MPSA §§ 6.3 or 18.4, the parties needed to have executed a written change request authorizing the additional charges before Open performed the additional work. According to the City, the services for which Open seeks payment are not associated with any formal change request or project amendment (ECF No. 124 at 12–13). Open again responds that if the City breached the contract, the City must pay for services Open rendered and for which Open would have received payment had the City not breached before the parties could execute a written change request. For the same reasons set forth above with respect to Open's un-invoiced services, if Open proves at trial that the City breached the contract by failing to comply with MPSA § 13.2, and that its compliance was not futile, the jury could award damages for the value of services that were not covered by an associated change request due to the City's wrongful termination before the proper change requests could be executed. *See Copper Creek Inc.*, 2022 WL 17454493, at * 9; *Montemayor*, 64 P.3d at 920. This issue must be left for the jury's consideration.

For these reasons, the Court DENIES the City's motion for summary judgment as to Open's claim for the amount of its services not covered by an associated change request.

c. Retainage amounts. Open seeks to recover $1,086,032.59 in retainage—i.e., the 10% of all invoiced amounts, withheld by the City, to secure Open's delivery of licenses, professional services, conversion services, support, and completed milestones (ECF No. 124 at 14–15; ECF No. 124-4 at 376; *see* ECF No. 124-14 at 5).

MPSA § 8.2(c) provided that the City would release the retainage to Open "after the Acceptance Date," meaning "the date the Customer has approved and signed the final test report, a document that formalizes the acceptance of the solution, at the end of the Acceptance Testing, as defined in SOW#1" (ECF No. 124-4 at 11, 20). Relying on this provision, the City argues that Open is not entitled to the retainage because the OSF project was never completed, meaning that the Acceptance Date upon which the retainage would be payable has not occurred (ECF No. 124 at 14–15). Once more, Open responds that the City cannot avoid paying the retainage based on a condition (i.e., the Acceptance Date's occurrence) that the City prevented the parties from meeting due to its improper termination of the contract (*id.* at 18–19). For the same reasons expressed above regarding Open's un-invoiced services and services not covered by an associated change request, if Open proves at trial that the City breached the contract by failing to comply with MPSA § 13.2, and that its compliance was not futile, the jury could award damages for the value of the retainage that would have been paid out on the Acceptance Date had City not wrongfully terminated. *See Copper Creek Inc.*, 2022 WL 17454493, at * 9; *Montemayor*, 64 P.3d at 920. This, too, is an issue for the jury.

For the above reasons, the Court DENIES the City's motion for summary judgment as to Open's claim for the retainage withheld by the City.

d. "Delta" damages under the First Amendment. Open seeks to recover a "delta" between the cost-share amount that it agreed to under the First Amendment (45%) and its purported actual share of responsibility for the OSF project's additional costs based on the parties' pre-First Amendment negotiations (27%) (*see* ECF No. 124-14 at 5). Open claims that this delta amounts to $551,901.15 (*id.*).

The City argues that Open is not entitled to the 18% delta because the pre-contract negotiations regarding each party's responsibility for OSF's additional costs have since been merged into the First Amendment, which explicitly states that the parties' cost-share obligations are Open 45%–City 55%, respectively (ECF No. 124 at 15–16). In response, Open contends that the 18% delta represents permissible reliance damages—i.e., $551,901.15 in waste resulting from Open covering higher costs than it was actually responsible for in reliance on the City's promise to meet its First Amendment obligations and to fully complete the project (ECF No. 154 at 21–22). The Court agrees with the City.

During their pre-First Amendment negotiations, the parties may have arrived at a different allocation of responsibility for the project's delays and increased costs than the figures ultimately reflected in the First Amendment (e.g., the Open 27%–City 73% distribution repeatedly cited by Open). However, the unambiguous language of the First Amendment reflects that the City agreed to cover 55% of the total additional cost, and "in recognition both Parties share responsibility for the issues driving the revised project schedule and added cost, Open has agreed to absorb 45% . . . of the additional cost" (ECF No. 124-8 at 2). "[U]nder law of merger, prior agreements, covenants, and conversations are merged into the final, formal, written contracts executed by the parties." *Batterman v. Wells Fargo Ag Credit Corp.*, 802 P.2d 1112, 1115 (Colo. App. 1990). And because

the parties agree that the MPSA and First Amendment are fully integrated documents, parole evidence of Open's "true" share of the responsibility for the project's delays and added costs is inadmissible "to add to, subtract from, vary, contradict, change, or modify" the agreements. *See Tripp v. Cotter Corp.*, 701 P.2d 124, 126 (Colo. App. 1985).

Accordingly, the Court GRANTS the City's motion for summary judgment as to Open's claim for "delta" damages under the First Amendment.

e.  Damages limited by the City's appropriated funds for the project. Under the Taxpayer's Bill of Rights (TABOR), a municipality may not, without advance voter approval, create any multi-year debts or financial obligations "without adequate present cash reserves pledged irrevocably and held for payments in all future fiscal years." Colo. Const. art. X, § 20(4)(b). Similarly, the City's Charter and Code both prohibit the City from incurring multi-year fiscal obligations unless contracts are made subject to appropriations. *See* Fort Collins City Charter § 8(b); Fort Collins Mun. Code § 8-186(b)–(c). Pursuant to these requirements, the MPSA and First Amendment both specified that the contract was subject to the appropriation of funds, and that the City could void it in any fiscal year for which no supporting appropriation was made. (*See* ECF No. 124-4 at 13; ECF No. 124-8 at 3).

Here, the City argues that Open's damages are limited to $148,517.32 (i.e., the difference between the $12,859,983 that the City appropriated for OSF between January 1, 2018, and June 16, 2020, and the $12,711,375.68 that the City spent or encumbered for OSF during the same period). Awarding damages above $148,517.32, the City argues, would require it to spend funds in excess of the amounts it appropriated for the project, thus violating TABOR, the City Charter, and the Municipal Code (ECF No. 124 at 16–19). In response, Open argues, among other things,

that the appropriations language in the parties' agreement does not purport to limit Open's recoverable damages (ECF No. 154 at 22–26). Here, the Court agrees with Open. The MPSA specifies that the City "shall have no obligation to continue this Agreement in any fiscal year for which no supporting appropriation has been made" (ECF No. 124-4 at 13), and the First Amendment similarly provides that "[i]n the event funds are not appropriated, the City reserves the right to void this First Amendment" (ECF No. 124-8 at 3). The plain language of these provisions, at most, would allow the City to void the MPSA if the Fort Collins City Council declined to fund the OSF project in any given year. Nothing in that language functions as a limitation on the City's liability in the event the City breaches the contract. *See Ark. Valley Drilling, Inc. v. Cont'l W. Ins. Co.*, 703 F. Supp.2d 1232, 1237 (D. Colo. 2010) ("Courts should be wary of rewriting contract provisions and should give the words contained in the contract their plain and ordinary meaning."). For the same reason, the relevant language contained in TABOR, the City Charter, and the Municipal Code does not function as a constitutional or statutory damages cap. *See Kulmann v. Salazar*, 521 P.3d 649, 653 (Colo. 2022) (in interpreting a constitutional amendment or local governmental enactment, a court will not add or subtract words).

Accordingly, the Court DENIES the City's motion for summary judgment to the extent that it seeks to limit Open's recoverable damages based on the contract and statutory provisions discussed above.

### 2.  *Open's Breach of the Implied Covenant of Good Faith and Fair Dealing Counterclaim*

The City argues that Open's counterclaim for breach of the implied covenant of good faith and fair dealing cannot succeed as a matter of law, both because (i) the implied covenant is inapplicable where there is an express covenant (i.e., a written contract) that covers the subject in

dispute, and (ii) the implied covenant only applies where the contract at issue specifically grants one party discretionary authority to determine certain contract terms such as quantity, price, or time (ECF No. 124 at 19–20). With respect to (i) above, the Court agrees.

Under Colorado law, "every contract contains an implied duty of good faith and fair dealing," which is "generally used to effectuate the intentions of the parties or to honor their reasonable expectations." *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995). However, the implied covenant "will not contradict terms or conditions for which a party has bargained." *Id.* Importantly, "[w]here the subject in dispute is expressly covered by the contract, the implied duty to perform in good faith does not come into play." *Salt Lake Tribune Pub. Co., LLC, v. AT&T Corp.*, 320 F.3d 1081, 1103-04 (10th Cir. 2003) (citation and internal quotation marks omitted).

Here, Open alleges that the City breached the implied covenant by failing to "(a) assign adequate staffing at all times capable of fulfilling the City's contractual obligations, including a competent project manager and project sponsor; (b) cooperate with Open's efforts to advance the project; (c) abide by project priorities, timelines, and scope; (d) supply information necessary to implement Open Smartflex with the City's existing systems and data; and (e) follow notice-and-cure protocols before terminating" (ECF No. 194, ¶ 193). But these allegations, if true, would establish a breach of the express terms of the MPSA and incorporated SOW (*see* ECF No. 124-4 at 7–8, 13–14, 47–57). Because Open's implied covenant claim is covered by express contractual terms, it cannot proceed. *See Marsh v. Delta Air Lines, Inc.*, 952 F.Supp. 1458, 1465 (D. Colo. 1997) (granting summary judgment on a claim for breach of the implied covenant "because a cause of action for breach of an express covenant of good faith and fair dealing is, in reality, a breach of contract claim.")

Accordingly, the Court GRANTS the City's motion for summary judgment as to Open's implied covenant counterclaim.[5]

### 3. *Open's Declaratory Judgment Counterclaim*

The City argues that Open's counterclaim for declaratory judgment is duplicative of its counterclaim for breach of contract and should be dismissed. The Court agrees.

"[A] trial court should consider whether an anticipatory declaratory judgment action is independent of and separable from the underlying action." *Const. Assocs. v. N.H. Ins. Co.*, 930 P.2d 556, 561 (Colo. 1996). Here, Open seeks a judicial declaration that "Open performed its express and implied contractual obligations or was prevented from performing those obligations by virtue of the City's preceding breaches of the MPSA and other conduct and that Open therefore is not liable to the City for breach of any contractual obligation of any kind" (ECF No. 194, ¶ 202).

Open's request for declaratory judgment is predicated on the City's alleged failure to provide adequate staffing for the OSF project—an allegation that Open also raised when claiming that the City breached the MPSA (ECF No. 194, ¶ 187). As the City correctly observes, "Open cannot prevail on its breach of contract counterclaim unless the Court necessarily determines that Open did not breach first, the City did breach, and that Open is entitled to recover damages caused by the City's breach of its obligations" (ECF No. 124 at 22). In this light, Open's declaratory judgment counterclaim is encompassed within—not independent of and separable from—the underlying breach of contract claim. *See TBL Collectibles, Inc. v. Owners Ins. Co.*, 285 F.Supp.3d

---

[5] In just one sentence, Open similarly asserts that summary judgment should enter on the City's claim for breach of the implied covenant of good faith and fair dealing (ECF No. 125 at 27). The Court declines to address this argument as cursory and not properly presented. *See Halik v. Darbyshire*, No. 20-cv-01643-PAB-KMT, 2021 WL 4305011, at *2 (D. Colo. Sept. 22, 2021) ("The court will not consider . . . issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation.") (citation omitted).

1170, 1195 (D. Colo. 2018) (a declaratory judgment claim may be dismissed "where a claimant seeks declaratory relief that would resolve the same issues raised by other claims brought in the same action"). As such, Open's request for declaratory judgment cannot proceed.

Accordingly, the Court GRANTS the City's motion for summary judgment as to Open's declaratory judgment counterclaim.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Defendants' Motion for Partial Summary Judgment (ECF No. 125) is DENIED.

2. Plaintiff The City of Fort Collins' Motion for Summary Judgment (ECF No. 124) is DENIED IN PART and GRANTED IN PART as follows:

   a. Summary judgment in favor of the City and against Open is DENIED on Open's claimed damages of $2,129,561.77 in connection with services Open had performed but not yet invoiced at the time the City terminated the contract;

   b. Summary judgment in favor of the City and against Open is DENIED on Open's claimed damages of $598,300 in connection with services Open rendered past the extended deadlines set in the First Amendment and PCR 29;

   c. Summary judgment in favor of the City and against Open is DENIED on Open's claimed damages of $1,086,032.59 in retainage withheld by the City pursuant to MPSA § 8;

   d. Summary judgment in favor of the City and against Open is GRANTED on Open's claimed damages of $551,901.15 resulting from the 18% "delta" between Open's

First Amendment cost-share (45%) and Open's purported actual share of responsibility for the OSF project's delays and added costs (27%);

e.  Summary judgment in favor of the City and against Open is DENIED to the extent that the City seeks to limit Open's recoverable damages to $148,517.32 based on Colo. Const art. 10, § 20, Fort Collins City Charter § 8(b), or Fort Collins Mun. Code § 8-186(b)–(c);

f.  Summary judgment in favor of the City and against Open is GRANTED on Open's counterclaim for breach of the implied covenant of good faith and fair dealing;

g.  Summary judgment in favor of the City and against Open is GRANTED on Open's counterclaim for declaratory judgment.

DATED this 22nd day of May 2023.

BY THE COURT:

_____
Charlotte N. Sweeney
United States District Judge